# In the United States Court of Federal Claims

No. 17-1407C
(Filed under seal February 8, 2018)
(Reissued February 16, 2018)†

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*  \*
                                                 \*

|  |  |
|---|---|
| **ARXIUM, INC.,** * | Post-award bid protest; Air Force |
| * | pharmacies; Federal Supply |
| Plaintiff, * | Schedule; GAO protest; arbitrary |
| * | corrective action; failure to consider |
| v. * | important aspects; latent ambiguity; |
| * | retroactive interpretation; unfair |
| **THE UNITED STATES,** * | discussions; arbitrary interpretation; |
| * | failure to allow revised proposals; |
| Defendant, * | injunctive relief. |
| * | |
| and * | |
| * | |
| **INNOVATION** * | |
| **ASSOCIATES, INC.,** * | |
| * | |
| Defendant-Intervenor. * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*  \*

    *Fernand A. Lavallee*, Jones Day, with whom were *J. Andrew Jackson*, *Cherie J. Owen*, *Alexander M. Yabroff*, *Ryan P. McGovern*, and *Robin Overby*, all of Washington, D.C., for plaintiff.

    *Sonia M. Orfield*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, all of Washington, D.C., for defendant. *Jared P. Weissberger*, Senior Counsel, Medical, DLA Counsel-Troop Support, with whom was *Gail Furman*, both of Washington, D.C., of counsel.

---

† The parties were given the opportunity to request redactions, and plaintiff and defendant did so. The Court found the requests to be overbroad, and accepted some of them, with redacted language replaced as follows: "[XXXX]." The opinion is reissued for publication with a few minor, non-substantive corrections.

  *Stuart B. Nibley*, K&L Gates, LLP, with whom were *Amy M. Conant* and *Erica L. Bakies*, all of Washington, D.C., for defendant-intervenor Innovation Associates, Inc.

## OPINION AND ORDER

WOLSKI, Judge.

  This post-award bid protest has been brought by plaintiff ARxIUM, Inc., the initial awardee under a Federal Supply Schedule (FSS) procurement. Following a successful Government Accountability Office (GAO) protest brought by intervenor Innovation Associates, Inc. (Innovation), the government changed its interpretation of two solicitation requirements, and as a consequence determined that ARxIUM's quotation was technically unacceptable. Plaintiff challenges this corrective action, and the resulting award to Innovation, as arbitrary and irrational.

  Before the Court are the parties' motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). As explained more fully below, the Court finds that it was arbitrary for the government not to amend the solicitation and accept revised quotations after its interpretation of the two requirements in question had changed. Accordingly, ARxIUM's motion for judgment on the administrative record and request for permanent injunctive relief are **GRANTED**, and the government's and Innovation's motions for judgment on the administrative record are **DENIED**.

## I. BACKGROUND

### A. Solicitation

  On August 11, 2015, the Defense Logistics Agency (DLA) issued Request for Quotations No. 1019219 (RFQ or solicitation) under the FSS on behalf of the United States Air Force for certain pharmacy automation equipment to be installed at four refill center sites: Lackland Air Force Base (AFB) in Texas, Luke AFB in Arizona, Nellis AFB in Nevada, and Patrick AFB in Florida. Admin. R. (AR) at 192, 196. The RFQ explained that, in response to a presidential mandate to reduce system error, the Air Force purchased "an Enterprise-wide Pharmacy Automation solution in 2002." *Id.* at 196. The Air Force intended to purchase new equipment to replace that aging infrastructure. *Id.* The final page of the RFQ was a "Caution Notice," advising potential awardees that their proposals must conform to the minimum requirements which followed. *Id.* at 199. The award was to be made to the lowest-price technically acceptable offer, and would result in four firm-fixed price delivery

orders under the FSS provisions of the Federal Acquisition Regulation (FAR). *Id.* at 197 (citing 48 C.F.R. § 8.405).

Two requirements in particular are relevant to this proceeding. The first is Minimum Requirement #23, which stated that "[w]hen verifying prescriptions, the solution shall allow the pharmacist to view the first fill image of the original written prescription and display electronic prescription data to assist in rapid verification." AR at 201, 329. The second requirement is for 36 "nesting stations" that were identified in a table describing the hardware to be installed at the four facilities. *Id.* at 204, 332. In the caution notice, a "nesting station" is defined as "an area on the conveyor system that has a nesting reader attached to it." *Id.* at 199. If a container for prescriptions known as a "tote" or "puck" was proposed by an offeror, these readers were to obtain information from the tote or puck concerning the prescriptions. *See* AR at 325. As we will see, Innovation, which had supplied the systems currently in use at the four refill centers, proposed using totes in which this information was contained in Radio-Frequency Identification (RFID) tags, *see* AR at 1434, 1444–45, while plaintiff proposed totes upon which this information was to be found on [XXXX] license plates, *id.* at 705.5.

## B. Evaluation of Quotations and Award of Contract

The two offerors, ARxIUM and Innovation, submitted responses by the initial August 28, 2015 deadline. Three rounds of formal discussion letters, as well as several emails, were sent by DLA to the offerors. *Id.* at 410, 483.[1] The first letters were sent on December 1, 2015. The letter to ARxIUM dealt with a number of minimum requirements---including a question, of relevance here, regarding requirement #23. The discussion question and ARxIUM's response are as follows:

> **Clarification Letter #1 dated December 1, 2015:** Please clarify if your proposed solution displays Original First Fill image of Rx and Electronic Rx info as required.

> **Arxium's Response to Clarification Letter #1 dated December 15, 2015:** "The proposed solution displays Original First Fill image of Rx and Electronic Rx info as required. This data is transmitted to our system via the [Air Force's Composite Healthcare System (CHCS)] interface."

AR at 433; *see also* AR at 703.7.

---

[1] The agency interchangeably referred to these as discussions, clarifications, and negotiations, and explained that their purpose was "to ensure that [offeror responses] were technically acceptable." AR at 410, 483.

A second letter, also dealing with a number of different topics, was sent to ARxIUM on February 17, 2016.  The relevant portion, along with ARxIUM's response, is reproduced below:

> For the nesting stations, the government is unclear of how the [XXXX] scanner meets the nesting station requirement. Is it handheld or attached directly to the conveyor? On the drawings, where is it installed? Please indicate. Please provide a drawing or specification sheet of the nesting station?
>
> **ARxIUM RESPONSE:** ARxIUM utilizes a functional equivalent to a nesting station that differs only in the scan method of identify[ing] a tote.
>
> A nesting station is a system fixture utilized to identify processing totes at a workstation via an RFID reader that scans an RFID chip attached to the tote. In this process, the technician removes the tote from the conveyor, places it in the nesting station and the RFID reader scans the chip and populates the workstation screen User Interface with the tote order data.
>
> ARxIUM accomplishes this identification process by utilizing the workstation's desktop [XXXX] scanner to read a [XXXX] tote "license plate" that is affixed to every tote. To conduct the identification process, the technician simply places the end of the tote in front of the desktop [XXXX] scanner and the scanner reads the [XXXX] and populates the workstation screen User Interface with the tote order data. Every ARxIUM workstation is equipped to read totes in this fashion.

AR at 705.5; *see also* AR at 480–81.

A final discussion letter was sent to ARxIUM on November 18, 2016.  AR at 924.1.  In this letter, DLA requested a number of screenshots of ARxIUM's proposed system, demonstrating how the system would meet various requirements, including requirement #23.  AR at 924.2.  On November 29, 2016, ARxIUM sent in a reply, including a screen shot of its system displaying first fill image data.  AR at 924.7.

Two months later, on January 26, 2017, DLA sent ARxIUM an email requesting additional information concerning plaintiff's nesting station proposal, which ARxIUM answered that same day.  In relevant part, DLA asked: "It appears that Arxium didn't mention[] if this was a fixed, or hand held [XXXX] reader—as

- 4 -

requested in the question.  Arxium didn't indicate (on a drawing) exactly where the [XXXX] Scanner was located—as requested in the question." AR at 481.  Plaintiff responded:

> The proposed solution utilizes a tabletop [XXXX] reader assembly that consists of a mounting base that holds a removable reader unit that is connected to the workstation via a USB data cable.  The mounting base is freely movable and can be positioned on the workstation surface according to the individual worker's preference.
>
> The [XXXX] scanner is positioned on the workstation surface adjacent to the monitor and data input devices (keyboard/mouse).  The specific positioning of the Scanner can be adjusted according to the individual worker's preference.

*Id.*

In its technical evaluation of ARxIUM's proposal, the agency analyzed each of its minimum requirements and reproduced the letters and exchanges above.  With regards to requirement #23, DLA noted that the screenshot from the third reply "displays First Fill Image and Electronic Rx when these items are transmitted from CHCS," and determined that ARxIUM's proposal met the requirement and was technically acceptable.  AR at 434.  Concerning the nesting station requirement, DLA explained that ARxIUM proposed "a [XXXX] scanner, mounted to a table, and attached to a workstation," which DLA found to meet the nesting station definition from the RFQ and, hence, to satisfy the requirement.  AR at 482.

Both ARxIUM's and Innovation's proposals were deemed technically acceptable by the agency.  AR at 482, 570.  ARxIUM's final price at the closing of best and final offers on February 9, 2017, was $4,487,573.68, while Innovation's was $4,494,706.74.  AR at 573.  Accordingly, ARxIUM was selected for the award on February 17, 2017.  AR at 574.

## C.  The GAO Protest and Corrective Action

Innovation challenged the award to ARxIUM by filing a protest with the GAO on February 27, 2017.  AR at 23.  Innovation contended that ARxIUM did not have an FSS contract when the quotes were due, AR at 30–32; that ARxIUM did not meet minimum requirement #23, the "first fill image" requirement, AR at 33–35; that ARxIUM did not meet minimum requirement #29 because its solution did not have the requisite printing capabilities, AR at 35–36; that ARxIUM did not meet minimum requirement #32 because its system did not place prescriptions directly into a container, AR at 36–38;  that ARxIUM did not meet minimum requirement

#33, a tote grouping requirement, AR at 39; that ARxIUM failed to provide the requisite "nesting stations," AR at 40–44; that ARxIUM did not meet the requirement to provide "robotic arms," AR at 44–45; and that the capabilities described in ARxIUM's proposal were not commercially available at the time of submission, in violation of RFQ requirements, AR at 46–47.

On June 6, 2017, the GAO issued its decision, denying the protest in part and sustaining it regarding the "first fill image" and "nesting station" requirements. AR at 1202. Concerning requirement #23, Innovation maintained that the "first fill images" of written prescriptions presented at Air Force retail pharmacy sites were scanned and stored in a server using its proprietary PharmASSIST Symphony Workflow Software (Symphony), which ARxIUM could not access. AR at 1204. The GAO rejected DLA's argument that vendors were not required to retrieve first fill images to meet requirement #23, and that the viewing of these images was contingent on the images being provided by the Air Force. *Id.* at 1204–05. Although DLA merely repeated requirement #23 when asked by a potential vendor to clarify whether retrieval of these images was required, the GAO found it "implicit in the requirement to view the first fill image that the pharmacist will necessarily need to retrieve the image as well." AR at 1205. The GAO concluded that because ARxIUM had not indicated how it could retrieve or otherwise create the image data, its proposal was deficient with regards to this requirement. *Id.*

As for the "nesting station" requirement, the GAO decision stated that Innovation had claimed "the term 'nesting station' is an industry standard term that describes a device into which the totes are placed for purposes of reading the identifying information." AR at 1206. After stating that "the record shows that [nesting station] is an industry standard term," the GAO noted that ARxIUM had described the term as "'a system fixture utilized to identify processing totes at a workstation via an RFID reader that scans an RFID chip attached to the tote.'" *Id.* at 1207 (quoting AR at 481). The GAO concluded that DLA improperly allowed ARxIUM to provide a solution that was "functionally equivalent" rather than employing the "particular hardware configuration" of a nesting station "as understood in the industry." AR at 1206–07. Therefore, the GAO sustained this part of the protest as well, and recommended that the agency amend the RFQ to "relax" these two requirements, if possible, or otherwise terminate the award to ARxIUM and issue the delivery orders instead to Innovation. AR 1207–08.

The Air Force then determined that it could not relax requirement #23 to eliminate the retrieval requirement which GAO found implicit in the RFQ. AR at 1220. In a re-evaluation of ARxIUM's proposal, the Air Force stated that 41% of its prescriptions consist of hardcopy images that are scanned directly into Innovation's Symphony database, and these images cannot be sent back to the Air Force's CHCS. AR at 1220. The Air Force noted it lacked "the manpower to print/scan images from

Symphony" for use in another database.  *Id.*  The Air Force concluded that ARxIUM could not retrieve first fill images from the Symphony database because Symphony was proprietary to Innovation, and thus was not acceptable for award.  *Id.*

Because the Air Force determined that requirement #23 could not be relaxed and that ARxIUM could not meet this requirement as it was now interpreted, the Air Force found it was unnecessary to amend the "nesting station" requirement.  AR at 1220.  Applying the GAO interpretation of "nesting station," the Air Force concluded that ARxIUM had not provided "nesting stations" but only a functional equivalent, and therefore ARxIUM's proposal was technically unacceptable.  AR at 1221.  On September 1, 2017, DLA revised its evaluation of the ARxIUM proposal in light of the GAO's decision.  AR at 1222–26.  The agency found, concerning requirement #23, that ARxIUM had "not demonstrated that it has the ability to retrieve [a first fill image] from Innovation's proprietary database," as its proposal instead assumed the images could be retrieved from the Air Force's CHCS.  AR at 1224.  Regarding the other requirement at issue, DLA stated that "[a] Nesting Station is composed of a Nesting Reader, which reads an RFID chip, attached to a tote basket."  AR at 1225.  It then found that ARxIUM's offer was technically unacceptable "[b]ecause Arxium did not offer a Nesting Reader, which reads RFID chips, but instead offered a [XXXX] reader."  *Id.*  After ARxIUM was excluded from the competitive range, AR at 1227, the contract was awarded to Innovation, as the only remaining offeror.  AR at 1231–32.

## D.  The Complaint

On October 2, 2017, ARxIUM filed its bid protest in our court, challenging its exclusion from the competitive range and the award made to Innovation.  Compl. at 1.  It alleges that the GAO decision was flawed concerning the nesting stations requirement, Compl. ¶¶ 48–59, and the first fill images requirement, *id.* ¶¶ 60–68, and that DLA's corrective action was improper in several respects, *id.* ¶¶ 69–85.  Plaintiff raises five separate counts.  First, it argues that DLA's corrective action was arbitrary, because this relied on an irrational GAO decision.  Compl. ¶¶ 87–94.  Second, it maintains that the corrective action was arbitrarily overbroad, failing to properly consider amending the RFQ and reopening discussions.  *Id.* ¶¶ 95–99.  Third, it contends that DLA's reevaluation of its proposal was arbitrary and insufficiently documented.  *Id.* ¶¶ 100–05.  The fourth count is that unstated evaluation criteria were applied in the competitive range determination.  *Id.* ¶¶ 106–08.  And finally, ARxIUM contends that the corrective action resulted in an improper sole source award.  *Id.* ¶¶ 109–11.

After an administrative record consisting of 71 tabs and more than 1,400 pages was filed and amended, the parties each filed motions for judgment on the administrative record.  In its motion, ARxIUM for the most part tracks the

allegations of its complaint.  Plaintiff argues that DLA irrationally relied upon the GAO decision, which it contends had no support for finding an industry definition of "nesting station" to displace the one contained in the RFQ, Pl.'s Mem. of Law in Support of Mot. for J. on Admin. R. (Pl.'s Br.) at 8–15; had improperly interpreted requirement #23 and irrationally failed to decide the issue of the Air Force's rights to the first fill image data, *id.* at 15–22; and should have instead dismissed Innovation's protest as an untimely challenge to solicitation terms, *id.* at 22–24 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007)).  Plaintiff also argues that DLA's corrective action was irrational because it followed the recommendation of the GAO, without properly considering such matters as whether the relevant RFQ terms were ambiguous, whether revised quotations and discussions should have been allowed due to the changed interpretation of these terms, and the extent of the rights the Air Force had to the first fill images.  *Id.* at 24–25.  And ARxIUM contends that DLA's corrective action was arbitrary because DLA itself did not consider whether the recommended action was appropriate and whether the RFQ could be amended, Pl.'s Br. at 27–28; because the agencies did not properly determine the government's rights to the first fill images and the definition of nesting stations, and thus were applying unstated evaluation criteria, *id.* at 29–31; and because DLA was essentially making a sole source award without following the proper procedures, *id.* at 32–33 (citing 48 C.F.R. § 6.303-1).[2]

In their cross-motions, the government and intervenor rebutted ARxIUM's points, arguing that the GAO's determination that ARxIUM failed to meet the minimum requirements was rational, that the agency's corrective action was reasonable and appropriate, and that the action did not prejudice plaintiff.  Def.'s Cross-mot. for J. on Admin. R. (Def.'s Br) at 13–40; Def.-Int.'s Cross-Mot. for J. on Admin. R. (Int.'s Br.) at 4–25.  After reply papers were filed, *see* Pl.'s Reply in Supp. of Mot. for J. on Admin. R. (Pl.'s Reply); Def.'s Reply in Supp. of Cross-Mot. for J. on Admin. R. (Def.'s Reply); Int.'s Reply in Supp. of Cross-Mot. for J. on Admin. R. (Int.'s Reply), the Court held a lengthy hearing on the motions, *see* Tr. (Nov. 15, 2017).  This opinion issues after a careful review of the arguments made at the hearing and in the briefs and the authorities cited, as well as a thorough consideration of the pertinent documents in the administrative record.[3]

---

[2]  In light of the disposition of this case, the Court finds it unnecessary to address several of the protest grounds raised by plaintiff.

[3]  The parties were orally informed of the Court's decision in a status conference in December, to allow the agencies to prepare their response to the injunctive relief.

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  Judgment on the Administrative Record in a Bid Protest

The Administrative Dispute Resolution Act (ADRA) amendments to the Tucker Act require our court to follow Administrative Procedure Act (APA) standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

> reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2012).

Based on an apparent misreading of the legislative history, *see Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that the *de novo* review standard of 5 U.S.C. § 706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as procurement awards.  *See Citizens to Pres. Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 415 (1971).  Instead, courts in those cases are supposed to apply the standard of 5 U.S.C. § 706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1099 (Fed. Cir. 2018) (applying 5 U.S.C. § 706(2)(A)).  *But see Impresa Construzioni Geom. Domenico Garufi v. United States* (*Domenico Garufi*), 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) (also citing 5 U.S.C. § 706(2)(D) as applicable in bid protests).  The "focal point for judicial review" is usually "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even when the matter under review was not the product of a formal hearing.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S.

729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

A motion for judgment on the administrative record under RCFC 52.1 differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005); *Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6, 21-22 (2013); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005); *Eco Tour*, 114 Fed. Cl. at 21–22; *McVey Co., Inc. v. United States*, 111 Fed. Cl. 387, 402 (2013). Factual findings are based on the evidence in the record, "as if [the court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp.*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, this court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Overton Park*, 401 U.S. at 416. Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* This court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). This court must determine whether "the procurement official's decision lacked a rational basis." *Domenico Garufi*, 238 F.3d at 1332 (adopting APA standards developed by the D.C. Circuit); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. U.S.*

*Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  This entails determining whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or made a decision that was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis." *Domenico Garufi*, 238 F.3d at 1333 (internal quotation marks omitted) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  The protester must demonstrate, by a preponderance of the evidence, the absence of any rational basis for the agency decision.  *See Enhanced Veterans Solutions, Inc. v. United States*, 131 Fed. Cl. 565, 578 (2017); *Harkcon, Inc. v. United States*, 132 Fed. Cl. 697, 700 (2017); *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003).  If arbitrary action is found as a matter of law, this court will then decide the factual question of whether the action was prejudicial to the bid protester.  *See Bannum*, 404 F.3d at 1351–54.

The interpretation of a solicitation, as that of contract provisions generally, is a question of law which courts review *de novo*.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004).  Whether a provision in a solicitation is ambiguous, and whether an ambiguity is latent or patent, are also questions of law over which courts exercise independent review on a case-by-case basis.  *NVT Techs.*, 370 F.3d at 1159; *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996).  When interpreting a solicitation, the document must be considered as a whole and interpreted in "a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote Corp.*, 365 F.3d at 1353; *NVT Techs.*, 370 F.3d at 1159.  If the provisions are clear and unambiguous, the court must give them "their plain and ordinary meaning." *Banknote Corp.*, 365 F.3d at 1353 (citation omitted).

### 2.  *Injunctive Relief*

In a bid protest, our court has the power to issue a permanent injunction pursuant to 28 U.S.C. §1491(b)(2).  In determining whether to grant a motion for a permanent injunction, the court applies a four-factored standard, under which a plaintiff must show: 1) that it has actually succeeded on the merits; 2) that it will suffer irreparable harm if the procurement is not enjoined; 3) that the harm suffered by it, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and 4) that granting injunctive relief serves the public interest. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir.

2009); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Mobile Med. Int'l Corp. v. United States*, 95 Fed. Cl. 706, 742–43 (2010). None of the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 378 (2009). Conversely, the lack of an "adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors," to deny the injunction. *Chrysler Motors Corp. v. Auto Body Panels, Inc. v. United States*, 908 F.2d 951, 953 (Fed. Cir. 1990). A lack of success on the merits, however, obviously precludes the possibility of an injunction. *See Wind Tower Trade Coalition v. United States*, 741 F.3d 89, 101 (Fed. Cir. 2014); *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 268 (2011); *Gulf Grp.*, 61 Fed. Cl. at 364.

## B. Analysis

The first count in ARxIUM's bid protest, Compl. ¶¶ 87–94, and its first two arguments for judgment on the administrative record, Pl.'s Br. at 8–25, concern the propriety of the GAO's decision to recommend corrective action. At first glance, this might seem like the logical place for our analysis to begin, as the GAO decision rested on its interpretations of terms in the request for quotations, AR at 1203–08, and such matters are question of law reviewed *de novo*, *see NVT Techs.*, 370 F.3d at 1159; *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 342 (2012) (*citing Banknote Corp.*, 365 F.3d at 1352–53, and *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed. Cir. 2004)). Moreover, were it not for the GAO sustaining (in part) Innovation's protest, DLA would have had no cause to revisit its decision to award the delivery orders to ARxIUM.

But the corrective action recommended by the GAO was *not* that the agency necessarily drop its interpretation of these terms in favor of those articulated by the GAO. AR at 1208. Rather, the GAO left it to the agency to determine if the latter would stick with its own interpretations, which would necessitate a formal modification and the evaluation of revised proposals, or follow the GAO interpretations, which would result in a termination of the award to ARxIUM and the issuance of the delivery orders to Innovation. *Id.* While even the road foregone could have been protested by ARxIUM, as requiring it to compete a second time for an award it already secured, *see Sys. Appl. & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (citing *CBY Design Builders*, 105 Fed. Cl. at 337), this element of choice made the corrective action more akin to the result of an agency protest, *see* 48 C.F.R. § 33.103. The specific action aggrieving ARxIUM was not merely the result of "an agency's decision to follow a GAO recommendation," *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011), but was due to a separate determination of the agency, *see* AR at 1222–27. Under these

circumstances, it seems more appropriate to begin the analysis with the procuring agency decision.

The ultimate decision being challenged is the Contracting Officer's removal of plaintiff from the competitive range, AR at 1227, due to DLA's determination that ARxIUM's proposal was technically unacceptable when measured against the GAO interpretations of the first fill image and nesting stations requirements, AR at 1222–26. Neither of these documents created by DLA---the Competitive Range Determination and the revised technical evaluation of ARxIUM's proposal upon which it was based---discusses whether the agency could "amend the RFQ to relax" the two requirements in question, *see id.*, although this option was the first part of the GAO recommendation, AR at 1208. It appears that DLA referred that decision to the customer for whom it was placing the orders, as the record contains a memorandum from the Air Force to the DLA which discusses that aspect of the GAO recommendation. AR at 1220–21.[4]

### 1. *Requirement #23 Regarding First Fill Images*

The Air Force memorandum never reaches the issue of whether the nesting stations requirement could be "relaxed" or amended, because the Air Force did "not find it acceptable to amend technical requirement #23" regarding the first fill image for prescriptions. *Id.* at 1220. The reason the Air Force would not agree to amend the first fill image requirement was its belated discovery that these images were kept in Innovation's Symphony system and could not be received by the Air Force's Composite Healthcare System (CHCS). *Id.* The Air Force stated its determination was "[b]ased on more thorough information regarding the [CHCS's] ability to receive the first fill image," and later explained that "CHCS is unable to receive images." *Id.* According to the Air Force, 41% of prescriptions are "hardcopy prescriptions" from an "external provider" that "are scanned directly into Symphony." *Id.* The Air Force noted that the volume of these hardcopy prescriptions ranges from 123,000 to 396,000 at the four refill centers, and that it did "not have the manpower to print/scan images" of this magnitude to enable them to be imported into another system. *Id.*[5] It concluded:

> Since the image is not in CHCS, the only vendor capable of retrieving it is one that has access to Symphony. Since Symphony is proprietary

---

[4] The Court is not persuaded by ARxIUM's arguments, *see* Pl.'s Br. at 28, that it was improper for DLA to refer this matter to the Air Force, or that DLA was not aware of this Air Force memorandum addressed to it, *see* AR at 1220.

[5] The numbers asserted by the Air Force are not supported in the record, but the Court finds no reason to doubt them.

> to Innovation, Arxium does not have the capability to retrieve first fill images that are scanned into Symphony and thus they are unacceptable.

AR at 1220.

Thus, the Air Force decided to follow the GAO interpretation of requirement #23, namely that offerors must either show that they can retrieve first fill images from the particular location in which the images are stored, or show "an alternative means" of "creating new first fill images." AR at 1205. Because the images are stored in Innovation's proprietary system, and the Air Force apparently lacked the resources to copy them to another location, the Air Force decided that to "relax" the requirement "would allow a system incapable of retrieving the first fill image to be found acceptable that would seriously impact pharmacy refill centers' operations." *Id.* at 1220. It then applied the GAO interpretation to ARxIUM's proposal and found it unacceptable, a judgment that was repeated by the DLA in its reevaluation, *id.* at 1224, and in its decision to remove plaintiff from the competitive range, *id.* at 1227.

The problem with these determinations, though, is that the reason that plaintiff had "not demonstrated that it has the ability to retrieve [a first fill image] from Innovation's proprietary database," *id.* at 1224, is that demonstrating such an ability had not been requested by the agency. In relevant part, requirement #23 states "[w]hen verifying prescriptions, the solution shall allow the pharmacist to view the first fill image of the original written prescription." AR at 201. The requirement does not specify that this image must be retrieved from a particular database, let alone one which is proprietary. The RFQ contains no discussion of any databases in which information is kept, *see* AR at 196–200, 318–33, and the only specific system mentioned in the requirements is CHCS, *see id.* at 329–31 (requirements #5, 7, 9–11, 35).[6] Other than CHCS, the RFQ requirements make several references to generic, commercial off-the-shelf (COTS) systems, as in: "The pharmacy automation solution shall interface with the Composite Healthcare System (CHCS) and other commercial off-the-shelf (COTS) pharmacy systems." *Id.* at 329 (requirements #5 & 35); *see also id.* (requirements #6, 7, 9–11).[7] Thus, no

---

[6] The equipment currently located at the four refill centers, but not the software or databases, is identified in the RFQ, *see* AR at 235, 239, 242–43, 246. The systems used at outpatient pharmacies are not discussed at all. *See* AR at 322.

[7] As ARxIUM points out, its proposal stated that its solution was "capable of interfacing with other COTS systems." Pl.'s Br. at 29 n.8 (citing AR at 703.4); *see also* Tr. at 27 (Nov. 15, 2017) (Tr.).

indication was given that the ability to view first fill images would require access to intervenor's proprietary database.

While it is "rare" for our court to find that an agency's decision was arbitrary because "the agency 'entirely failed to consider an important aspect of the problem," *CBY Design Builders*, 105 Fed. Cl. at 344 (quoting *Ala. Aircraft*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)), the record shows that this is just such a case. Indeed, the procuring agency, its client, and the GAO all failed to consider *several* important aspects of the corrective action ultimately taken by DLA, all arising from the RFQ's failure to mention that first fill images are stored in a particular contractor's proprietary database.

First, no consideration was given to the possibility that plaintiff could meet the first fill image requirement, as interpreted by the GAO, in a revised proposal once the interpretation of this provision was settled. The Air Force concluded that "only Innovation Associates can meet technical requirement #23 as written," because the images are stored in Symphony and "Symphony is proprietary to Innovation." AR at 1220. And as we have seen, DLA found ARxIUM's proposal technically unacceptable because plaintiff did not show it could retrieve first fill images "from Innovation's proprietary database." AR at 1224. Neither agency explains why it is significant that the software used for the database in which the first fill images are stored is proprietary to intervenor. If the government's position is that only Innovation can access data stored in this database, and thus only intervenor can be technically acceptable, then plaintiff would be entitled to an award of its bid preparation and proposal costs, for having been unfairly induced into believing that an actual competition was being conducted. *See Centech Grp., Inc. v. United States*, 79 Fed. Cl. 562, 564, 577 (2007) (holding that offeror may be entitled to bid preparation costs that were "wasted" due to agency's error in interpreting solicitation requirement); *cf. Concept Automation, Inc. v. United States*, 41 Fed. Cl. 361, 369–70 (1998) (awarding bid preparation costs to offerors when "misleading solicitation" resulted in a contract award using "rules [that] had been covertly changed").

The Court presumes that the Air Force and DLA were relying on the arguments made by Innovation before the GAO, and the supporting declaration from an Innovation employee. *See* AR at 34–35, 168–69; *see also* Def.'s Br. at 22; Int.'s Br. at 15–16. The employee stated that the Symphony software Innovation was proposing for use at the refill centers could connect to the Symphony systems into which the first fill images were scanned at outpatient pharmacies, but that "no mechanism" allows the Symphony outpatient systems to transmit images to non-Symphony systems. AR at 169. He added that plaintiff had not "ever requested access to Innovation's Symphony databases." *Id*. Based on this, Innovation argued that "[w]ithout such access granted by Innovation," the ARxIUM system "cannot

receive first fill images from out-patient retail sites that use Innovation's Symphony system to store first fill images." AR at 35.

But these statements and arguments hardly establish that it was within Innovation's power to decide who had access to the first fill images and, thus, who could compete with it for this particular contract. Since the RFQ did not inform potential offerors of the need to show the ability to access data kept in a Symphony database, ARxIUM had no reason to approach Innovation to request access to the database or to pursue a "mechanism" to connect with it.[8] But by taking an interested party's word for it, the government again entirely failed to consider a number of important aspects of the problem of whether ARxIUM could propose retrieval of these images. As plaintiff points out, under provisions of the Defense Federal Acquisition Regulation Supplement (DFARS), the first fill images might be "technical data" which the government had an unrestricted right to use for its purposes. Pl.'s Br. at 19–21 (citing, *inter alia*, 48 C.F.R. §§ 227.7102-4(a)(1); 252.227-7013(a)(1), (15); 252.227-7015(a)(5), (b)(1)(iv)). Although the question of the Air Force's intellectual property rights in this data was flagged by the GAO, *see* AR at 1205–06 n.4, neither the Air Force nor DLA considers this, or any other rights the government might have under the contract(s) through which the images are scanned into Symphony at the outpatient retail pharmacies. The government cannot rationally conclude that the storage of these images in the Symphony database impedes its access and that of its contractors to the images, without considering the rights and responsibilities established by the contract(s) under which the images are scanned and stored.

Of course, electronic access to the Symphony database is not the only means by which first fill images may be obtained for use at the refill centers. The GAO decision noted that the ARxIUM proposal did not show "that it was offering an alternative means either of retrieving the currently extant first fill images or creating new first fill images." AR at 1205.[9] On this score, the Air Force considered that *it* did "not have the manpower to print/scan images from Symphony for import

[8] The Court notes that the exhibit filed with the GAO to show that the PharmASSIST Symphony system was an "approved system of record" used to store copies of first filled images, appears to be a notice that was circulated internally among Air Force outpatient pharmacies, and not a document designed to notify the public of this system. *See* AR at 174.

[9] The GAO also noted that plaintiff omitted information showing "that such an alternative means has been approved as an alternative system of record." AR at 1205. Since the RFQ does not restrict quotations to offerors with such an approved system of record, this consideration is irrelevant to the procurement.

into another COTS system," AR at 1220, but entirely ignored the possibility that ARxIUM could propose to do this. The procuring agency, DLA, did not at all consider the possibility of *anyone* printing and scanning these images, and instead focused on plaintiff's mistaken belief that the images could be retrieved from CHCS. *See* AR at 1222–24.

The record shows that the government itself had earlier held the same mistaken view concerning the transmittal of first fill images from CHCS. After several rounds of discussions, during which two inquiries were made to plaintiff concerning requirement #23, DLA concluded that ARxIUM's "proposed solution displays First Fill Image and Electronic Rx *when these items are transmitted from CHCS*," and thus "meets this requirement and has been determined to be technically acceptable." AR at 434 (emphasis added). And after Innovation responded to a discussion item with an explanation of how its Symphony program would allow the refill centers to obtain first fill images from the outpatient pharmacy systems, DLA found this "further capability" to be beyond the required "capability to display the first fill image." AR at 510–11. The agency based this on its belief that first fill image "data is transmitted to [Innovation's] system *via the CHCS interface.*" AR at 511 (emphasis added).[10]

This brings us to another important aspect of the corrective action that the government entirely failed to consider. After switching to the GAO's interpretation of requirement #23---namely, that an offeror must show the ability to retrieve first fill images from the Symphony database, either by connecting with the database or through alternative means, AR at 1205---the government applied this to ARxIUM's existing proposal, AR at 1220–27, which was the product of lengthy discussions, *see* AR at 410–82. As this was an FSS procurement, the formalities of the FAR subpart governing negotiated procurements did not automatically apply, *see* 48 C.F.R. § 8.404(a)---including FAR subsection 15.306(d), the provision regarding discussions, *see Concourse Grp., LLC v. United States*, 131 Fed. Cl. 481, 488 (2017); *IBM Corp. v. United States*, 119 Fed. Cl. 145, 157–58 (2014); *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 15–16 (2012); *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 139 (2009). Nor did the RFQ---which merely informed vendors that "[t]he Government may elect to issue an award without discussions," AR at 197---incorporate FAR § 15.306 either by reference or by implication through adoption of a specified procedure. *See Distributed Sols.*, 106 Fed. Cl. at 15; *Unisys Corp.*, 89 Fed. Cl. at 139–40.

---

[10] Although these evaluations were performed by DLA, this was "in conjunction with the Air Force," as "[d]uring the evaluation process, the Air Force was consulted as the end user, and as the expert on pharmacy protocol, pharmacy equipment knowledge and operation, and to address any concerns during the offer evaluation process." AR at 410, 483.

- 17 -

But our case law has established that discussions held in FSS procurements may not be arbitrary, and are scrutinized for fundamental fairness. *Concourse Grp.*, 131 Fed. Cl. at 488 (citing *Distributed Sols.*, 106 Fed. Cl. at 16 n.9); *IBM Corp.*, 119 Fed. Cl. at 157 (citing *Unisys Corp.*, 89 Fed. Cl. at 140). Decisions have found the government's approach to discussions to be fair when the protester's "proposal did not contain any potential nonconformities with the solicitation," *IBM Corp.*, 119 Fed. Cl. at 158, or was not judged to contain significant weaknesses, *Unisys Corp.*, 89 Fed. Cl. at 141. Here, at the time discussions were conducted, the agency believed that first fill images could be obtained from CHCS, and that offerors need not show the ability to retrieve these images from any other location in order to meet requirement #23. *See* AR at 434, 511. If the agency had instead known that the images were kept in the Symphony database, and had interpreted requirement #23 the way the GAO ultimately did, its discussions with ARxIUM would have addressed these matters, as the acknowledged purposes of the discussions were "to address any concerns during the offer evaluation process" and to "ensure" that responses "were technically acceptable, or if further clarifications/discussions were required." AR at 410, 483. Retroactively applying the GAO interpretation of requirement #23 to ARxIUM's proposal renders the discussions arbitrary and unfair to plaintiff, as it was not afforded the opportunity to address the failure of its proposal to meet the new interpretation.

While the GAO recommendation appropriately called for "revised quotations" were DLA to "relax" the requirements at issue in its decision, AR at 1208, the Air Force, DLA, and the GAO all failed to consider that the GAO interpretations amounted to a "tightening" of the requirements relative to their meaning during discussions. The Court agrees with plaintiff's contention that, under these circumstances, it was arbitrary for the government not to reopen discussions and accept revised proposals. *See* Pl.'s Br. at 2, 25; Pl.'s Reply at 25.

This particular flaw in the corrective action traces back to the GAO's decision and recommendation. After finding "implicit" in requirement #23 the ability to retrieve the first fill images from the database in which they are stored, and then conditioning this ability on supposed impediments due to the proprietary nature of the image repository, AR at 1205, the questions of whether this requirement was ambiguous and whether ARxIUM's interpretation of it was reasonable should have been considered when recommending corrective action. The GAO was not presented with a matter in which express language of a requirement was overlooked by an agency and an offeror. Instead, the requirement being interpreted was that "the solution shall allow the pharmacist to view the first fill image of the original prescription." AR at 329. Again, nothing is said about retrieval from a particular database, let alone one which was proprietary to Innovation.

Rejecting the agency's interpretation, the GAO explained that "the words 'when available or when provided by the Air Force' are not found in the RFQ's statement of minimum requirements." AR at 1204 n.3.[11]  But the need to retrieve the images from the particular database in which they are stored was also not expressed.  And the GAO acknowledged that, when asked by an offeror to "clarify if the solution must be capable of retrieving the 'first fill image' from the system used at the outpatient pharmacy," *see* AR at 322, the agency "just restated the RFQ's requirement, which did not address whether the system had to be capable of retrieving the image," AR at 1205.  Thus, not only does the requirement not mention retrieval from the system database, but the agency refused the opportunity to make such an interpretation clear.

As the plain text of the requirement does not unambiguously require retrieval from the pharmacy system database, the reasonableness of the interpretation proffered by ARxIUM should have been considered by the GAO.  *See Banknote Corp.*, 365 F.3d at 1353.  The only specific system identified in the RFQ was CHCS.  *See* AR at 329–31.  The language of other requirements is consistent with an interpretation of requirement #23 which does not require offerors to show that data can be retrieved from a particular, proprietary database.  To meet requirement #5, offerors had to show the ability of their solution to "interface" with CHCS "and other commercial off-the-shelf (COTS) pharmacy systems."  AR at 329.  The special need to retrieve data from a particular COTS system is not mentioned.  The next requirement concerns the "order entry workstation" required at two of the refill centers.  Instead of stating that the solution must *retrieve* images, the requirement states that it "shall capture a digital image of the provider's written prescription *by accepting* the digital image from the COTS pharmacy system."  *Id.* (emphasis added).  This seems to place the onus on the COTS pharmacy system to deliver the data, rather than on the refill center system retrieving it.

Extrinsic evidence in the record further supports the reasonableness of ARxIUM's interpretation.  A Request for Information (RFI) was posted by DLA during the market research phase of the procurement "to determine the physical and technical capabilities of commercial pharmacy automated dispensing systems currently available in the market place."  AR at 580.  One question asked vendors if their systems were "able to accept a B2K (uni-directional) CHCS interface."  AR at 581.  Another began with the premise:  "Upon *receiving information* from CHCS or a

---

[11]  As the GAO protest concerned the interpretation of terms in the RFQ, rather than the claim that the terms were unlawful, ARxIUM is wrong in its assertion, *see* Pl.'s Br. at 22–24, that the protest was untimely under *Blue & Gold Fleet*. Likewise, Innovation's argument that ARxIUM should somehow have challenged the application of the new GAO interpretation earlier than it was applied, *see* Int.'s Br. at 18–19, is not availing.

COTS pharmacy system, the system shall automatically fill a prescription." *Id.* (emphasis added). Both of these questions suggested that the agency was looking for a system that was to be receiving data it made available, not retrieving the data from a special source. And the specific question that concerned verification using the first fill image asked if a system would "allow the pharmacist to view the image of the original written prescription," again with no reference to the need to retrieve the image from a particular location. AR at 582.[12]

Innovation argues that the "GAO adopted the only reasonable interpretation of Requirement 23 when read in the context of the RFQ as a whole." Int.'s Br. at 9. This interpretation, however, rested on neither the text of the RFQ nor the information in the record that was considered by the agency when it drafted the RFQ, but instead on information about the Symphony system provided by Innovation in its protest. *See* AR at 1204–05. Curiously, the government also argues that the GAO interpretation was "the only reasonable reading of the requirement," Def.'s Br. at 20, although, as we have seen, the agency had previously read it not to require retrieval from a particular database, *see* AR at 511. The government's initial interpretation of requirement #23 was adopted, to be sure, before it had received "more thorough information regarding the Composite Healthcare System's (CHCS) ability to receive the first fill image," AR at 1220, but this placed it on the same footing as ARxIUM and all other vendors other than Innovation, who had no reason to know that the images were stored in a particular proprietary database.

Taking into consideration that the RFQ did not notify vendors that the images were stored in a proprietary database; that the agency declined to clarify whether retrieval was required; that the agency believed the images could be transmitted by CHCS and interpreted the provision as not requiring retrieval from another source; and that the RFI and RFQ discuss accepting and receiving information, but not retrieving it, the Court concludes that plaintiff's interpretation of requirement #23 was within the "zone of reasonableness," *NVT Techs.*, 370 F.3d at 1162 (citation omitted), making the requirement ambiguous.

Since ARxIUM's interpretation of requirement #23 was reasonable, any resulting ambiguity is construed against the government as drafter, unless the ambiguity was patent and the corresponding duty to inquire was not satisfied. *Id.* A patent ambiguity is "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap." *WPC Enters. v. United States*, 163 Ct. Cl. 1, 6 (1963). But the absence of language concerning the need to retrieve first fill images from a

---

[12] The Court further notes that the RFI asked vendors if their systems interface with several, named "commercial pharmacy systems," not one of which was the PharmASSIST Symphony system. *See* AR at 584.

particular proprietary database was not the sort of "obvious, gross, or glaring" ambiguity that is patent.  *NVT Techs.*, 370 F.3d at 1162 (citing *H & M Moving, Inc. v. United States*, 204 Ct. Cl. 696, 716 (1974)).  The RFQ contains no discussion of any "system of record" holding these images, *see* AR at 196-200, and the requirements that concern a "COTS pharmacy system" discuss "accepting" or "receiving" information from such systems, not retrieving it, *see* AR at 329.  Nor did the vendor's question which sought to clarify whether a retrieval capability was required mention that the images were stored in a particular, proprietary database, but merely referred to "the system used at the outpatient pharmacy."  AR at 322.  Even if it turns out that these images are stored in a proprietary database which poses obstacles to their retrieval, nothing in the RFQ suggests this is the case, and thus the failure to address retrieval from such a location is not the sort of glaring gap that would be patent.

Clearly, the errors detailed above were to ARxIUM's prejudice, as "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (citations omitted).  The government argues that plaintiff could not have been awarded the contract, as its proposal assumed it would obtain the first fill images from CHCS, which is apparently incapable of receiving and storing them.  Def.'s Br. at 41–42; Def.'s Reply at 19–20.  But since the RFQ did not inform vendors that this data was stored in the Symphony database, and plaintiff reasonably interpreted the requirement not to involve retrieval from a proprietary database (as did the government when proposals were evaluated, *see* AR at 511), the issue is not whether ARxIUM's existing proposal could be awarded the contract, but rather whether a revised proposal could.  To this point, Innovation argues that ARxIUM was not prejudiced by the agency's treatment of requirement #23, contending that the costs to plaintiff of accessing these images from Symphony or otherwise collecting them would exceed the price advantage of ARxIUM's quotation.  Int.'s Br. at 16–17.  But whether the scanning and storing of these images in the Symphony database actually imposes special access costs depends on several important things that DLA and the Air Force failed to consider, such as the government's rights to the data and Innovation's responsibilities under its other contract(s), and Innovation is merely speculating as to the costs to ARxIUM to collect the data through alternative means.  Indeed, we cannot know whether the Air Force and DLA will wish to amend the RFQ to require retrieval of first fill images from the Symphony database, once they have properly considered these issues.  Plaintiff, having submitted the lowest quotation earlier in the procurement, certainly has a substantial chance of award once the government properly decides what it is requiring.

### 2. The "Nesting Stations" Requirement

The other RFQ requirement at issue in this protest concerned "nesting stations," which the RFQ defined as "an area on the conveyor system that has a nesting reader attached to it." AR at 199. When ARxIUM's final quotation was first evaluated, it was found to meet this requirement. AR at 481–82. The GAO sustained Innovation's protest of this determination, finding that DLA relaxed the requirement and allowed ARxIUM to meet it with a "functionally equivalent" solution. AR at 1206–07. According to the GAO, "nesting station" was shown by the record to be an "industry standard term," which was "understood in the industry as describing a particular hardware configuration." *Id.* at 1207. Although the GAO did not expressly state the meaning of this term, it earlier claimed that "[a]ccording to the protester, the term 'nesting station' is an industry standard term that describes a device into which the totes are placed for purposes of reading the identifying information." AR at 1206.

The Air Force never reached the issue of whether the RFQ could be formally amended to "relax" this requirement, because it determined that the first fill image requirement could not be relaxed. AR at 1220. It instead adopted the purported industry definition of "nesting station," and noted that ARxIUM stated that nesting stations use RFID readers to scan RFID chips attached to totes. AR at 1221. The Air Force found that plaintiff failed to propose nesting stations, because ARxIUM "provided a functionally equivalent alternative in which they utilize [XXXX] scanners to read the [XXXX] tote, and the user must be involved in the reading process." *Id.*

In its revised technical evaluation, DLA stated that "[a] Nesting Station is composed of a Nesting Reader, which reads an RFID chip, attached to a tote basket." AR at 1225. It claims that ARxIUM "acknowledged this definition," and found that plaintiff did not offer anything meeting the requirement, because plaintiff "did not offer a Nesting Reader, which reads RFID chips, but instead offered a [XXXX] reader." *Id.*; *see also* AR at 1227 (removing ARxIUM from competitive range, in part because plaintiff "did not offer Nesting Stations with Nesting Readers").

The crux of this matter is whether DLA and the Air Force require the prescription information which is attached to a tote---the container holding medications---to be contained in a RFID chip or would accept it on a [XXXX], and whether they require these containers to be placed in a basket when the information is read or scanned. The agencies obviously did not interpret the nesting stations requirement as precluding [XXXX] scanning and as requiring baskets, as the discussions with plaintiff and evaluation of its proposal make plain. *See* AR at 480–82. Although the parties spend a considerable amount of space on this issue,

*see* Pl.'s Br. at 1, 8–15, 30–31; Int.'s Br. at 6–9, 22–23, 26; Def.'s Br. at 5–7, 14–19, 29, 33, 37–38; Pl.'s Reply at 1–3, 5–10, 20–22; Def.'s Reply at 4–9; Int.'s Reply at 2–5, the Court will address it briefly, as the government will not be precluded from amending the RFQ to make clear which of these options are allowable and/or required.

The GAO determination that "the record shows" that "nesting station" is an "industry standard term" is not supported by a citation to the record, *see* AR at 1207, and the parties have not pointed to anything in the record that suggests such an industry standard (or recognized term of art) exists. Its earlier statement that "[a]ccording" to Innovation, "the term . . . is an industry standard term that describes a device into which the totes are placed," AR at 1206, is also not supported by the record, as Innovation made no such claim in its papers and certainly cited no evidence in support of the proposition, *see* AR at 40–44, 1151–54. Indeed, as the RFQ defines "nesting station" as "an *area* on the conveyor system that has a nesting reader attached to it," AR at 199 (emphasis added), it would be peculiar if by "area" the agencies meant "a device." It seems that GAO was confusing "tote nest," which Innovation stated was the device that holds totes and reads them at the nesting stations currently in use at the refill centers, *see* AR at 40–43, with the station itself.

Instead of relying on any industry understanding, Innovation contended before the GAO that "nesting stations" were so called because of the presence of "tote nests," which use "nesting readers" to obtain information from totes. AR at 41–43, 1152–53.[13] According to intervenor, a nesting station needs a tote nest, and a tote nest must necessarily hold the object from which the information is obtained. *See id*. One problem with this argument, as ARxIUM notes, *see* Pl.'s Br. at 13 n.2; Pl.'s Reply at 9, is that during discussions, Innovation took the position that RFID readers that were "mounted in the conveyor frame," and which obtain information from the RFID tags on totes not by holding the totes but by reading the tags as the totes pass over the devices, "meet the definition of the term Tote Nest as well," AR at 1444–45. If a "tote *nest*" can earn the monicker without holding a tote, it is hard to see why a "nesting station" or a "nesting reader" necessarily requires a device that holds a tote. It seems that what makes a tote nest is its ability to read RFID information from a tote, not whether it holds the tote when it does this.

---

[13] Similarly, during discussions Innovation did not reference any industry standard or understanding regarding the term, instead stating that in its "proposed solution the term 'Nesting Station' has been interpreted to mean the addition of a tote nest device to a filling workstation or verification workstation." AR at 1434. Innovation went on to explain:  "The addition of a tote nest to any workstation gives that workstation the ability to read an RFID tote in the same way as the addition of a [XXXX] scanner gives any workstation the ability to read [XXXX]." *Id*.

Nor does the language cited by the GAO from one of ARxIUM's discussion responses establish or even claim that "nesting station" has a particular meaning in the industry.  *See* AR at 1207.  In that response, plaintiff appears to be describing the manner in which the existing nesting stations at the refill centers functioned, identifying tote information "via an RFID reader that scans an RFID chip attached to the tote."  *Id.*; *see also* AR at 481.  Regardless of whether the existing system used a process in which "the technician removes the tote from the conveyor, [and] places it in the nesting station," AR at 1207, the point of ARxIUM's response was that it "accomplishes this identification process by utilizing the workstation's desktop [XXXX] scanner to read a [XXXX] tote 'license plate' that is affixed to every tote," AR at 481.  Because it was proposing a different method of reading the tote information, plaintiff called its solution a "functional equivalent" to the existing, RFID-reading nesting stations.  AR at 480.

From ARxIUM's use of the phrase "functional equivalent," it seems the GAO concluded that DLA "essentially" took the position that the plaintiff deviated from proposing a "nesting station."  AR at 1206–07.  But DLA found that ARxIUM proposed a nesting station that *met* the RFQ definition.  AR at 482.  The GAO essentially faulted ARxIUM for not proposing a device with an RFID reader which holds a tote while reading the tote's RFID chip.  But DLA informed offerors, during discussions:  "Since the RFQ does not state RFID as a requirement, RFID does not have to be used.  Hence, workstations under RFQ 1019219 do not need to be RFID tote enabled.  As long as your solution can meet all of the requirements with/without RFID, that solution would be acceptable."  AR at 979, 1450.[14]  With the use of RFID technology not required, it is hard to see how a nesting station can rationally be interpreted as requiring an RFID reader, such as a tote nest.  Again, the RFQ definition of nesting station was "an area on the conveyor system that has a nesting reader attached to it."  AR at 199.  As DLA had made it clear that it was acceptable for offerors to meet requirements without RFID, AR at 979, ARxIUM's use of a [XXXX] scanner to read the tote information needed no relaxation of requirements.

As we have seen, there is no support in the record for a finding that "nesting station" is some sort of term-of-art with a settled understanding in the industry, such that the Air Force and DLA may have been unwittingly requiring a particular type of reader by using the term.  And evidence in the record contradicts any notion that the agencies were consciously requesting tote readers that hold the totes while

---

[14]  It does not appear that any of the parties drew this language to the attention of the GAO, although it was contained in Exhibit 22 to the Agency Report.  *See* AR at 979.

reading them.  Amendment 0002 to the RFQ included the responses to vendors'
questions.  When asked to 'clarify the term 'Nesting Station,'" DLA merely repeated
verbatim the definition contained in the RFQ.  AR at 325.  Another question asked,
"Does 'Nesting Station' refer to 'having the ability to read a tote'?"  *Id*.  Rather than
state that the term referred to a reader which *holds* totes, DLA responded:  "If totes
or pucks are quoted, then a nesting station is required to read the totes/pucks."  *Id*.
And in the initial evaluation of ARxIUM's quotation, DLA expressed no concern
about whether the nesting station had a device to hold totes when reading them,
but instead wanted to know if the [XXXX] scanner was fixed or handheld.  AR at
480–81.

Because it believed that ARxIUM could not meet the first fill image
requirement, the Air Force chose not to consider amending the RFQ to reflect what
it really expected of "nesting stations."  *See* AR at 1220.  The Air Force instead
followed the GAO's lead, displacing the RFQ definition of "nesting station" with the
supposed industry definition of "a device into which the totes are placed for
purposes of reading the identifying information," again with no support.  AR at
1221.  After citing ARxIUM's description of the incumbent system, the Air Force
found plaintiff's proposal not to contain nesting stations but a "functionally
equivalent alternative in which they utilize [XXXX] scanners to read the [XXXX]
tote, and the user must be involved in the reading process."  *Id*.  What the Air Force
meant by the latter phrase is not clear, as a user's involvement in holding a tote
under a scanner or in placing it inside a reading device would seem to be
indistinguishable.[15]

In any event, DLA's reevaluation of the ARxIUM proposal said nothing about
a problem with user involvement.  It stated that "[a] Nesting Station is composed of
a Nesting Reader, which reads an RFID chip, attached to a tote basket."  AR at
1225.  The agency's only support for this is the claim that plaintiff "acknowledged
this definition in [its] responses" during discussions.  *Id*.  But the quoted passage,
discussing the incumbent's system, says nothing about any "basket," ambiguously
stating that a "technician removes the tote from the conveyor [and] places it in the
nesting station," *id*., which could mean merely putting the tote within the area in
which the reading is to take place.  The agency reiterated the conclusion that

---

[15]  Innovation argues that the use of a device which holds and reads one tote at a
time is a safety feature, preventing operators from mixing up the totes.  Int.'s Br. at
23; Int.'s Reply at 4.  But its support is its own argument and a declaration of its
own employee, not of anyone from the agencies.  AR at 170–71, 1153.  Although it is
hard to see how an operator who is holding a tote in his hands while scanning it
could confuse that tote with others, this is the sort of judgment to which a court
could defer---when made by an agency, that is, and not by one of the competitors.

ARxIUM "offered a functionally equivalent solution" rather than a nesting station, explaining that because plaintiff "did not offer a Nesting Reader, which reads RFID chips, but instead offered a [XXXX] reader, [its] offer is technically unacceptable." *Id.*[16]   Again, since the offerors were told that the use of RFID technology was not required, that "workstations" as a consequence "do not need to be RFID tote enabled," and that a solution "would be acceptable" if it met requirements without the use of RFID, AR at 979, 1450, it was arbitrary for the agency to base unacceptability on the absence of RFID readers.

And as with the first fill image requirement, the retroactive imposition of this definition results in the discussions being arbitrary and unfair, as plaintiff had not been informed that its failure to utilize a basket or other type of container, and failure to use RFID technology, were concerns which would make its proposal unacceptable.  But regarding the nesting stations requirement, it is not known if it matters to the Air Force and DLA whether offerors use baskets to hold totes for reading, and they clearly are indifferent to the use of RFID technology. Nevertheless, it was arbitrary to find ARxIUM's proposal to be unacceptable on this ground, when no industry understanding of the term has been rationally identified to displace the broad definition which plaintiff had been found to meet.[17]   Since neither a basket to hold totes nor RFID technology was required by the RFQ, if the agencies change their minds and decide to require these elements, they must amend the RFQ and allow revised quotations.

### 3.  Injunctive Relief is Appropriate

Having succeeded on the merits, plaintiff satisfies the first of the four factors that must be considered when determining if permanent injunctive relief is appropriate.  *See Centech Grp.,* 554 F.3d at 1037.  Concerning the second factor, it is well-established that the profits lost by an offeror because of the government's arbitrary evaluation of an offer constitute irreparable injury for purposes of injunctive relief.  *See MORI Assocs., Inc. v. United States,* 102 Fed. Cl. 503, 552 (2011).  The alternative to a permanent injunction---recovery of bid preparation and

---

[16]  The Court notes that Innovation equated the functionality of RFID readers with [XXXX] scanners in its discussion responses.  *See supra* note 13 (citing AR at 1434).

[17]  Indeed, there is no basis in the administrative record for concluding that the "nesting" label for these stations refers to the placement of totes in a holder similar to a nest, as opposed to other explanations, such as a metaphor for the place prescriptions go before they are ready to enter the world.  But even if it were the former, this could merely reflect the incumbent's use of a device it calls a tote nest at these stations, AR at 1445, and be merely incidental as opposed to essential to the function of reading the information on a tote.

litigation costs---does not redress the loss of the opportunity to compete on a level playing field for a valuable business contract. The Court finds that, absent injunctive relief, plaintiff will suffer irreparable harm. *See* Hansen Decl. ¶¶ 3–4, Ex. B to Pl.'s Br.

The third injunctive relief factor is whether the harm to plaintiff if the procurement decision is not enjoined outweighs the harm to the government and third parties which would result from the injunction. *Centech Grp.,* 554 F.3d at 1037. If the decision to remove ARxIUM from the competitive range and award the delivery orders to Innovation is not enjoined, then plaintiff loses the opportunity to compete for the profits from a $4.5 million contract. On the other side of the ledger are potential costs to the government, and to active duty and retiree military families, due primarily to the age of the refill systems that are being replaced. *See* Def.'s Br. at 45–46; Def.'s Reply at 23–24. These systems were first purchased in 2002 and upgraded in 2006, and when down for repairs the Air Force must use a commercial retail network at an additional cost to it of $45.69 per prescription, with potential co-pays for the prescription purchasers. Mounts Decl. ¶¶ 3, 5, Ex. 1 to Def.'s Br.

In addition, [XXXXXXXXXXXX] are no longer received from the manufacturer, and the Air Force has temporarily [XXXXXXXX] in the hope that the system will soon be replaced. *Id.* ¶ 4. If the Air Force reverses course and requires a custom support agreement [XXXXXXXX], the costs could be $191,666 each month, retroactive to last July, and the manufacturer will discontinue this support in July of this year. *Id.* There is also the prospect of additional labor and construction costs due to delays in the installation of the new system, and $1 million in funding could be lost to the Air Force if the installation is not completed by September 30, 2018. *Id.* ¶ 6. Finally, termination of the Innovation orders could also result in reimbursement claims for labor and material. *Id.*

Innovation, for its part, in addition to echoing the government's concerns, *see* Int.'s Reply at 19–20, argues that it would be harmed by a delay in its performance of the contract, Int.'s Br. at 29. But since the award decision was arbitrary, for the reasons explained above, intervenor cannot yet claim any entitlement to the contract and the fruits of performance.[18]

Although this is a close question, the balance of harms factor tips in ARxIUM's favor. While concerns over [XXXXXXXXXXXXXXXXXXXX] are no doubt

---

[18]  In this regard the matter at hand is far different from the authority Innovation relies upon, *ViON Corp. v. United States,* 122 Fed. Cl. 559 (2015), in which the protester lost its challenge on the merits, *see id.* at 579–80.

serious, these risks have been tolerated by the Air Force for more than half a year, and it is not clear why they could not be tolerated for a few months more as the agencies correct their procurement mistakes. Any additional prescription costs due to downtime were the current system to need repair, while potentially serious, might never materialize. And no reliable basis for assessing any projected construction delay costs has been provided. *See* Mounts Decl. ¶ 4.[19]

Indeed, much of the prospective harm identified by the government is either something that can be avoided, controlled, or mitigated by the government---such as the choice to purchase a custom support agreement rather than [XXXXXXX] [XXXXXXXXXXXX]---or is the result of the government's own delays and procurement errors, for which it cannot be credited, *see Manus Medical LLC v. United States*, 115 Fed. Cl. 187, 195 (2014). And if the government is concerned that appropriated funds might be lost if the installation is not completed by the end of September, an injunction will not prevent it from accelerating the required time period for installation. The Court notes that the initial acquisition plan anticipated a delivery schedule of 120 days. AR at 576.

The fourth factor considers whether "the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037. As our court has frequently recognized, "[a]n important public interest is served through conducting 'honest, open, and fair competition' under the FAR, because such competition improves the overall value delivered to the government in the long term." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 294 (2016) (citing *CW Government Travel, Inc. v. United States*, 110 Fed. Cl. 462, 496 (2013)); *see also Arch Chems.*, 64 Fed. Cl. at 400 (discussing the purposes served by competition). Thus, "[t]he public interest is not served when a government contract that is subject to competitive bidding is arbitrarily awarded." *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 515 (2005). Even in a more loosely-regulated FSS procurement, the integrity of the competitive process demands that---after discussions have been held--- the government not change its interpretation of a latently ambiguous requirement, or change to an arbitrary and unsupported interpretation of another requirement,

---

[19] Both Innovation and the government cite to construction delay costs relating to Luke AFB that had been given as a reason to override the CICA stay. *See* Int.'s Br. at 29 (citing AR at 1192); Tr. at 223 (citing AR at 1192–96). But those estimates far exceed the incurred costs identified by the Air Force. *Compare* Mounts Decl. ¶ 4 (noting $20,000 in labor costs and $80,000 in construction delays as of October 25, 2017) *with* AR at 1194 (identifying delay costs of $10,000 per day). Moreover, despite the alleged need to install the Luke AFB refill center equipment with dispatch, under Innovation's schedule of performance installation at that base was to be the third of the four, beginning nearly eight weeks after the first base. Ex. 1 to Def.'s Status Report Re: Schedule of Performance, ECF No. 19-1.

without providing offerors with proper notice and the opportunity to submit revised quotations.

To be sure, as Innovation has noted, *see* Int.'s Br. at 29, there is also a "public interest in minimizing disruption" to the relevant agencies, *Akal Security, Inc. v. United States*, 87 Fed. Cl. 311, 321 (2009) (citing *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 80 (2007)). But as the progenitor of intervenor's cited authority explains, that interest may be served by injunctive relief which is "tailored" to result in a "reduced level of disruption," *Heritage of Am.*, 77 Fed. Cl. at 80, which the Court believes will be the case here. Accordingly, plaintiff satisfies this factor, as well.

Under these circumstances, the Court finds it appropriate to enjoin DLA from proceeding with the award made to Innovation under this RFQ. Because of the latent ambiguity in requirement #23, which failed to inform vendors that first fill images needed to be retrieved from a particular proprietary database or collected by an alternative means, an award cannot be properly made until the RFQ is amended to clearly state the Air Force's requirement (including the identification of the Symphony database), and offerors are given the opportunity to submit revised quotations. And since "nesting station" was arbitrarily re-interpreted to involve a device utilizing a basket-like container to hold totes while information from the totes is read, if the agencies wish to require such a container functionality, the RFQ must be amended to reflect this. In addition, if the agencies have changed course and now would require RFID technology to be used with the totes, an amendment to the RFQ is also necessary.[20]

One of the problems with this procurement, however, was that the Air Force and DLA did not properly consider the rights the government has to the first fill images, and the responsibilities imposed on Innovation by any contracts under which these images are collected and stored. Once these issues are properly considered, the agencies might determine that their (and their contractors') access to these images is not impeded by storage in the Symphony database. Or they may conclude that the retrieval of the images should not be the responsibility of the awardee under the refill centers procurement. On the other hand, the agencies may conclude, after proper consideration of their rights, Innovation's responsibilities, and the time-sensitive nature of the procurement, that they would be justified in cancelling this procurement and making a sole source award. The Court does not intend that its injunction be construed as preemptively precluding a cancellation decision, as the appropriateness of such an action cannot be prejudged.

---

[20] The agencies are, of course, free to make other amendments to the RFQ, such as shortening the time period for installation.

For the reasons discussed above, the Court is granting ARxIUM's motion for judgment on the administrative record and request for injunctive relief.  But because cancellation is being left open as a possibility, the Court will defer the entry of judgment in this case.  Mindful of the government's desire to move quickly on this matter, the Court will require that defendant file a status report within fourteen days of the date of this opinion, informing the Court if the agencies have decided either to amend the RFQ or to cancel the procurement.  If the latter route is taken, plaintiff may either move for an award of bid preparation and proposal costs, or file a supplemental complaint to challenge the action, within fourteen days of the cancellation decision.[21]  If the RFQ is amended, then judgment will be entered within fourteen days of the status report, unless ARxIUM believes that the amendments effectively preclude its ability to compete for the award---in which case it may move for an award of bid preparation and proposal costs within those fourteen days.

## III. CONCLUSION

For the reasons discussed above, the Defense Logistics Agency acted arbitrarily and capriciously in excluding ARxIUM from the competitive range and making an award to Innovation Associates under RFQ1019219.  Plaintiff's motion for judgment on the administrative record is **GRANTED**, and the cross-motions of defendant and intervenor are **DENIED**.  Plaintiff has proven its entitlement to a permanent injunction rescinding the contract award to Innovation Associates.

Accordingly, **IT IS ORDERED** that the United States, including the Defense Logistics Agency, its Contracting Officer, and its other officers, agents, servants, employees, and representatives, and all other persons acting in concert and participating with them respecting the procurement under RFQ1019219, are RESTRAINED AND ENJOINED from proceeding with the award to Innovation Associates.

Pending further order of the Court, **IT IS ORDERED** that the United States, including the Defense Logistics Agency, its Contracting Officer, and its other officers, agents, servants, employees, and representatives, and all other persons acting in concert and participating with them respecting the procurement under RFQ1019219 are hereby RESTRAINED AND ENJOINED from awarding a task order under RFQ1019219 or allowing any contractor to perform under any task order under RFQ1019219 until the solicitation is amended to clarify minimum requirement #23 and the "nesting station" requirement.

---

[21]  Failure to file a supplemental complaint before judgment is entered in this case will not eliminate any right plaintiff has to initiate a new protest, either at our court or the GAO.

Judgment will not be entered at this time.  Defendant shall file a status report on or by **Thursday, February 22, 2018**, informing the Court whether the RFQ has been amended or other action has been taken concerning this procurement.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge